NEW CASTLE COUNTY COUNCIL,
Defendant Below, Appellant,

v.

BC DEVELOPMENT ASSOCIATES,
Plaintiff Below, Appellee.

Supreme Court of Delaware.

Submitted: Sept. 26, 1989.
Decided: Dec. 13, 1989.

Michael Mitchell (argued), New Castle County Law Dept., Wilmington, for appellant.

Edward M. McNally (argued) and Barbara MacDonald, Morris, James, Hitchens & Williams, Wilmington, for appellee.

Before HORSEY, WALSH and HOLLAND, JJ.

WALSH, Justice:

New Castle County Council ("Council") appeals from a decision of the Court of Chancery granting partial summary judgment in an action challenging Council's denial of a rezoning application made by appellee, BC Development Associates ("BCD"). The Court of Chancery held that Council's denial was arbitrary and capricious because Council failed to articulate the rationale underlying its decision, as required by *Tate v. Miles*, Del.Supr., 503 A.2d 187 (1986). In its appeal, Council raises four challenges to the Court of Chancery's decision. First, Council argues that the record created in connection with BCD's application provides adequate support for its actions and thus obviates the need for a more direct statement of the Council's reasoning. Second, Council alleges that BCD's proposed rezoning was manifestly contrary to the Comprehensive Development Plan adopted by New Castle County pursuant to 9 *Del.C.* § 1344. Council argues that this fact alone is sufficient to justify its actions. Third, Council contends that even if the Court of Chancery correctly determined that the decision must be set aside, the Court erred in remanding the case directly to Council. Rather, it is argued, *Tate v. Miles* requires that the entire zoning process be repeated. Finally, Council alleges that the Court of Chancery abused its discretion by dismissing without prejudice certain constitutional claims made by BCD.

Having reviewed the record created by Council during its consideration of BCD's application, we find that it provides an inadequate explanation of the reasoning underlying Council's actions. Without such an explanation, we cannot determine whether Council has acted in accordance

with requirements imposed by the General Assembly. Thus, we find that Council's decision must be invalidated. However, we believe that the zoning process should be reinitiated, lest the Council base its decision upon information and analysis that have become stale through the passage of time. Accordingly, we affirm the Court of Chancery's decision in all respects except for the remedy. The earlier proceedings must be vacated and new proceedings begun.

## I

The property that is the subject of BCD's rezoning application (the "subject property" or the "property") consists of approximately thirty-one acres of largely undeveloped land, located near the intersection of the Concord Pike and Silverside Road. The subject property, originally owned by the Brandywine Country Club, was sold to Louis Capano and Sons, Inc. pursuant to an agreement of sale dated November 21, 1984. The buyer's rights under the agreement were then assigned to BCD, an affiliate of the buyer.

Although the subject property was zoned for residential use at the time of sale, it is located along a stretch of highway that has undergone extensive commercial development in recent years. BCD intended to develop a shopping facility on the subject property. Accordingly, it introduced before the Council an ordinance that would rezone the property and amend the New Castle County Comprehensive Development Plan (the "Comprehensive Development Plan" or the "Plan") to reflect the new use. Pursuant to 9 *Del. C.* § 1153(a), the proposed ordinance was referred to the Department of Planning (the "Department") and the Planning Board (the "Board") of New Castle County for their study. The Department and the Board conducted an extensive analysis of BCD's planned devel-

opment. They considered the overall compatibility of the project with its surroundings, as well as its impact on traffic flow, storm water drainage, and sewer facilities. The Department and the Board held a public hearing on December 15, 1985. Several months later, on October 21, 1986, the Department and the Board issued a recommendation that Council approve BCD's proposed ordinance. They found that the subject property was unsuitable for residential development and that BCD's proposal would fit in well with the property's surroundings. However, the recommendation was conditioned upon BCD's agreement to aid in the completion of planned highway improvements.

Council scheduled a public hearing on September 22, 1987 to allow consideration of the proposed ordinance. Because this hearing is the centerpiece of the record upon which Council relies to justify its decision, some explanation of what occurred at the hearing is appropriate. The hearing began with a presentation by BCD's attorney. He focused his discussion upon the various concerns raised by the Department and the Board in their consideration of the ordinance, attempting to show that BCD had designed its proposal to meet each of these concerns. Several members of Council questioned BCD's attorney regarding the assumptions upon which BCD's study of traffic flow was based. Particular attention was focused on the effect that the completion of a highway known as the "Blue Route" would have upon traffic flow along the Concord Pike.[1]

The floor was then opened to public comment. A representative of the Brandywine Country Club and a local businessman spoke in favor of the rezoning. An attorney for Widener University then spoke in opposition.[2] He questioned the desirability of further construction in an already heavi-

---

1. The study found that intersections affected by the BCD development would operate at from 120% to 141% of capacity during peak hours, a level of use deemed acceptable by the Delaware Department of Transportation. Several Council members questioned the study's assumption that 15% of the traffic currently travelling the Concord Pike would be siphoned off when Pennsylvania completed the Blue Route in 1995. The

author of the BCD study opined that even if completion of the Blue Route had no effect on the Concord Pike, the affected intersections would still operate at the levels predicted by the study.

2. Widener's Delaware Campus is adjacent to the northern boundary of the subject property.

ly developed area. He also suggested that the rezoning would impair the quality of life at the University and in the surrounding area. In particular, he voiced a fear that consumption of alcoholic beverages at a restaurant planned for BCD's shopping facility would threaten the safety of students. Several members of Council questioned Widener's attorney concerning the University's efforts to purchase the subject property both before and after its acquisition by BCD. He suggested that the subject property would provide an excellent location for either University buildings or a conference center or community center of some sort.

The Vice President of the Council of Civic Organizations of Brandywine Hundred (the "CCOBH") then addressed the Council and challenged the advisability of further commercial development in the area. He argued that the communities he represented would be better served if the subject property were sold to Widener University or developed as residential property. The CCOBH representative also argued that the rezoning was contrary to the Comprehensive Development Plan and that the Plan should not be modified on an *ad hoc* basis. The members of Council and the CCOBH representative then engaged in a discussion concerning the relationship between the proposed ordinance and past and future rezoning actions in the Concord Pike area.

Several local residents voiced their opposition to the ordinance. They included a local businessman who argued that a new shopping facility would pose a competitive threat to existing retailers. Council then closed the public debate portion of the meeting and Councilman Aiello introduced into the record a letter from "A Concerned Citizen." The letter alleged that the members of Council had taken bribes from the developer to win their approval for the rezoning.

Council proceeded to discuss the proposed ordinance among themselves and concluded with a vote. Councilmen LaPenta and Purzycki stated that they considered commercial development to be the best pos-

sible use of the subject property. Accordingly, they both voiced their support for the recommendation of the Department and the Board. Council President Peterson stated that she would oppose the rezoning, and that her "decision really hinged on the issue of traffic more than anything else." She then explained how she had contacted the Pennsylvania Department of Transportation ("PennDOT") to elicit its view of the effect of the "Blue Route" on Concord Pike traffic. She reported that the PennDOT employee with whom she spoke expected the impact of the new highway to be negligible. Thus, Council President Peterson challenged the value of the traffic study upon which BCD relied and cast her vote against the rezoning.

Councilman Cecil first stated that he was "in a bit of a dilemma" and would abstain because he could not accurately gauge the wishes of the residents in the district that he represented. Several minutes later, however, he cast his vote against the ordinance without comment. Councilman Ianni questioned representatives of BCD and the CCOBH concerning the traffic patterns that could be expected along the Concord Pike if the Blue Route siphoned off no traffic. Councilman Ianni then cast his vote against the ordinance without specifying the basis of his opposition. Finally, Councilmen Aiello and Roberts voted against the rezoning without comment. Thus, the final vote against the ordinance was five to two. Of those opposing the rezoning, only Council President Peterson explicitly stated the reason for her vote.

BCD filed its Chancery Court action on March 7, 1988. In a memorandum opinion, the Court of Chancery granted BCD's motion for summary judgment. *BC Dev. Assocs. v. New Castle County Council*, Del. Ch., C.A. No. 9714, Berger, V.C., 1988 WL 130634 (Dec. 6, 1988). The Vice Chancellor held that although the record provided some basis for Council's actions, a reviewing court must not be left to speculate on the rationale underlying a given zoning action. Rather, unless Council's reasoning is patently obvious from the record, the members of Council must articulate the basis for their votes.

## II

■ When Council considers a zoning ordinance, it is acting in a legislative capacity. Nevertheless, the legislative power that reposes in the Council is not inherent; rather, it has been delegated to Council by the General Assembly. 9 *Del.C.* § 2601. Thus, in the realm of rezoning, the power of Council is analogous to that of an administrative agency, since the fundamental power to regulate land use rests with the General Assembly. Del. Const. art. II, § 25; *Hayward v. Gaston*, Del.Supr., 542 A.2d 760, 766 (1988). It is true that the delegation of the General Assembly's authority to the counties of Delaware is broadly cast. Under 9 *Del.C.* § 2601, Council

> may, in accordance with the conditions and procedure specified in this subchapter, regulate the location, height, bulk and size of buildings and other structures, the percentage of lot which may be occupied, the size of yards, courts and other open spaces, the density and distribution of population, the location and uses of buildings and structures for trade, industry, residence, recreation, public activities or other purposes and the uses of land for trade, industry, residence, recreation, public activities, water supply conservation, soil conservation or other similar purposes, in any portion or portions of New Castle County which lie outside of incorporated municipalities. . . .

However, it is axiomatic that delegated power may be exercised only in accordance with the terms of its delegation. *See* Del. Const. art. II, § 25; *Green v. County Planning & Zoning Comm'n of Sussex County*, Del.Ch., 340 A.2d 852, 856–57 (1974), *aff'd sub nom. Sea Colony, Inc. v. Green*, Del.Supr., 344 A.2d 386 (1975); *Kreshtool v. Delmarva Power & Light Co.*, Del.Super., 310 A.2d 649, 654 (1973); *Mitchell v. Delaware Alcoholic Beverage Control Comm'n*, Del.Super., 193 A.2d 294, 310–311 (1963), *rev'd on other grounds*, Del.Supr., 196 A.2d 410 (1963). *See also Lyng v. Payne*, 476 U.S. 926, 937, 106 S.Ct. 2333, 2340, 90 L.Ed.2d 921 (1986); *Morgan v. United States*, 298 U.S. 468, 478–80, 56 S.Ct. 906, 910–11, 80 L.Ed. 1288 (1936); *American School of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 107–110, 23 S.Ct. 33, 38–39, 47 L.Ed. 90 (1902) (cases discussing limits of delegated power in various contexts). The General Assembly has mandated that the regulations adopted by Council must "be in accordance with a comprehensive development plan adopted pursuant to [9 *Del.C.* ch. 13]" and must "be designated and adopted for the purpose of promoting the health, safety, morals, convenience, order, prosperity or welfare of the present and future inhabitants of [Delaware]." 9 *Del.C.* § 2603.[3] Zoning regulations that are not reasonably related to one of these enumerated purposes may be set aside as arbitrary and capricious. *Willdel Realty, Inc. v. New Castle County*, Del.Supr., 281 A.2d 612, 614 (1971).

■ These empowering statutes leave Council with a great deal of discretion to determine how best to promote the goals

---

3. In determining whether a given regulation serves this purpose, Council must seek to promote:

> amongst other things, the lessening of congestion in the streets or roads or reducing the waste of excessive amounts of roads, securing safety from fire and other dangers, providing adequate light and air, preventing on the one hand excessive concentration of population and on the other hand excessive and wasteful scattering of population or settlement, promoting such distribution of population and such classification of land uses and distribution of land development and utilization as will tend to facilitate and provide adequate provisions for public requirements, transportation, water flowage, water supply, drainage, sanitation, educational opportunities, recreation, soil fertility, food supply, protection of the tax base, securing economy in governmental expenditures, fostering the State's agricultural and other industries and the protection of both urban and nonurban development.

9 *Del.C.* § 2603(a).

> In addition, 9 *Del.C.* § 2603(b) requires that: [t]he regulations shall be made with reasonable consideration, among other things, of the character of the particular district involved, its peculiar suitability for particular uses, the conservation of property values and natural resources and the general and appropriate trend and character of land, building and population development.

announced by the General Assembly. It must be stressed, however, that this broad latitude does not arise simply because the actions of Council are labelled "legislative." Council's authority arises by operation of statute, and to the extent that it is limited, the same statutes control. Thus, when the validity of a zoning regulation is judicially challenged the standard for review is whether the action is in compliance with applicable statutes. The correct interpretation of statutes is a question of law, and the review of this Court on legal questions is plenary. *E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, Del.Supr., 498 A.2d 1108, 1113 (1985). Of course, the broad terms of the relevant statutes insure that a reviewing court must frequently find that Council has acted within the realm of its authority. For this reason, the decisions of Council carry a presumption of validity and the burden of rebutting that presumption is placed upon the challenging party. *McQuail v. Shell Oil Co.*, Del.Supr., 183 A.2d 572, 579 (1962). Nevertheless, rulings in which zoning regulations have been overturned for failure to meet statutory standards are hardly unprecedented. *See, e.g., Green v. County Council of Sussex County*, Del.Ch., 508 A.2d 882 (1986), *aff'd*, Del.Supr., 516 A.2d 480 (1986); *Green v. County Planning & Zoning Comm'n of Sussex County*, Del.Ch., 340 A.2d 852 (1974), *aff'd sub nom. Sea Colony, Inc. v. Green*, Del.Supr., 344 A.2d 386 (1975). Thus, the courts have a definite, albeit limited, role to play in the zoning process.

■ When Council makes a rezoning decision without establishing the basis for its action, it thwarts the ability of a court to provide effective review. As we stated in *Tate v. Miles*, Del.Supr., 503 A.2d 187, 191 (1986), "[u]nless Council creates a record or states on the record its reasons for a zoning change, a court is given no means by which it may review the Council's decision." Thus, when a court overturns an action taken by Council because of a failure

to articulate reasons, it is not necessarily holding that the action was not in accordance with the law and therefore was arbitrary and capricious. Rather, it is holding that Council has not permitted the Court to perform its role in the review process, *i.e.*, to form an opinion of the propriety of Council's action. Of course, when a zoning regulation is not supported by an adequate record the inference that Council has acted arbitrarily arises naturally. However, even where Council's actions appear reasonable, unless the underlying rationale is clear, the reviewing court cannot properly discharge its duty.

### A.

Council's principal argument upon appeal is that the record, standing alone, provides an adequate basis for reviewing Council's compliance with statutory standards. Council stresses that *Tate v. Miles* gives Council two options: either it must "state[ ] on the record its reasons" *or* it must "create[ ] a record." Without question, Council has created a record. Therefore, Council argues that we should scour the record for evidence to support its actions and if some evidence to that effect is found, uphold the result.

■ We do not believe that such a literal reading of *Tate v. Miles* is warranted. It is true that *Tate* allows Council a measure of flexibility. Council need not draft a detailed statement of findings of fact and conclusions of law in order to explain a given zoning regulation. However, insofar as Council simply "creates a record" and relies upon that record to justify its decision, the record must prove to be an adequate substitute for a more formal explanation. Thus, Council's reasons must be clear from the record. If several possible explanations for a given decision appear on the record, the reviewing court must not be left to speculate as to which evidential basis Council favored.[4] We lay down no

---

**4.** Relying upon *Searles v. Darling*, Del.Supr., 83 A.2d 96 (1951) and *Application of Beattie*, Del. Super., 180 A.2d 741 (1962), Council alleges that the courts of the State have traditionally applied a less searching standard of review to the decisions of the Board of Adjustment. Council argues that it would be anomalous to require a "legislative" body to state the reasons for its decisions while not imposing the same requirement upon a mere "administrative" body such

precise formula that Council must follow in order to satisfy the *Tate* requirements. Nevertheless, we believe that when Council is faced with a particularly complex zoning application and a large body of conflicting evidence is presented for its consideration, a formal statement of its findings would greatly aid the process of judicial review.

 Our own examination of the record in this case leads us to concur in the Court of Chancery's finding that Council failed to satisfy the *Tate* standard. Of the five Council members who voted against the proposed ordinance, only Council President Peterson gave any direct explanation of her reasons for doing so. Arguably, the questions posed by Councilman Ianni just prior to his "no" vote demonstrate that he too was concerned about the impact of the rezoning upon traffic flow. However, there is no logical reason to impute the views of these two members to the entire Council in the absence of some articulation indicating agreement. Indeed, Councilman Cecil stated that he felt that BCD had adequately addressed the public's concern over traffic and appropriate land use. Moreover, the evidence and testimony presented during the course of the hearing is simply too extensive and contradictory to allow us to conclude that concern over traffic flow was the only possible explanation for Council's opposition to the rezoning. As the record reveals, various individuals expressed concern over storm water drainage, appropriate land use, and the effect of development upon neighboring Widener University, as well as traffic flow. Any of these concerns might arguably support Council's decision, but none of the members pointed to these matters as justification for their votes. As a result, the Court is left to guess whether these factors played any part in Council's decision.

The record also reveals that some discussion at the hearing focused on the competitive impact of new development upon existing businesses. While we have no occasion to consider whether limiting competition is an appropriate basis for denying a zoning application, the record does not dispel the impression that Council may have relied upon this as grounds for rejection of rezoning. In sum, the record presents a murky picture of the reasoning underlying Council's decision. As a result, it provides an inadequate basis for judicial review.

B.

 Council argues that the proposed rezoning was contrary to the Comprehensive Development Plan and that this fact alone justified the ordinance's rejection. It is true that under 9 *Del.C.* § 2603(a), Council may decline to enact a proposed rezoning because it is in conflict with the Plan. Council is also vested with the power to amend the Plan to allow a rezoning that it determines is appropriate. 9 *Del.C.* § 1344(b). Thus, while the fact that an ordinance conflicts with the Plan supplies Council with a valid reason for rejecting the ordinance, it does not automatically dictate that result. If Council chooses to reject a rezoning proposal because of a conflict with the Plan, it should cite this conflict as the basis for its action. We see no reason to distinguish this particular reason for a rezoning ordinance's rejection from any of the other possible rationales that Council might adopt. The fact that the record provides evidence that a given theory could have supported Council's decision does not allow us to conclude confidently that Council actually relied upon that theory. Thus, we decline to create an exception to the general rule announced in *Tate.*

III

 We turn now to the question of the appropriate remedy for Council's error. In *Tate,* we held that when a county's

as the Board of Adjustment. However, the cases upon which Council relies draw a clear distinction between the factual findings of the Board of Adjustment and the questions of law presented to a court for review. While findings of fact are presumed valid if supported by "substantial evidence," questions of law are subject to plenary review. *Application of Beattie,* 180 A.2d at 744. If a decision of the Board of Adjustment did not contain enough information to permit a meaningful review of legal questions presented, there is no reason why a court could not apply a *Tate*-like analysis in order to set aside the decision.

council fails to state reasons for a zoning decision, the council should not be permitted simply to supply a rationale upon remand. A remand limited to another vote by Council would allow "a dubious method of *ad hoc* after-the-fact legislation." Therefore, we held that "[t]he hearing process must ... begin anew." *Tate*, 503 A.2d at 192.

In this case, the Court of Chancery ordered that Council hold a new public hearing before reconsidering BCD's proposal. We believe, however, that the lapse of time between the original consideration of the rezoning and the conclusion of this appeal renders this remedy inadequate. It has been over three years since the Board and the Department issued their recommendation that the ordinance be adopted. During that time, much of the information upon which the parties relied has doubtless become outdated. In particular, traffic patterns along the Concord Pike may have developed in a manner that would either vindicate or discredit BCD's projections. Just as this Court must be given an adequate explanation of Council's reasoning in order to reach a meaningful decision, so also Council must have up-to-date information in order to evaluate the proposed zoning effectively.

Nor is it necessary to draw a bright line to establish when the entire rezoning process must be repeated. If a court can confidently conclude that the information available to Council is not outdated, then a new public hearing followed by a new vote and an adequate explanation of Council's decision may provide a sufficient remedy. In a case such as this one, however, where there is reason to believe that repeating the process could provide Council with more

current information, a simple rehearing must be considered inadequate.[5]

## IV

▮ Finally, Council argues that the Court of Chancery erred in dismissing without prejudice certain claims raised by BCD under the Delaware and United States Constitutions. Council alleges that because the claims were fully briefed, they should have been resolved, so as to allow a complete adjudication. However, it is well-established in Delaware that "a constitutional question will not be decided unless its determination is essential to the disposition of the case." *Downs v. Jacobs*, Del. Supr., 272 A.2d 706, 708 (1970). The Court of Chancery did not abuse its discretion in determining that BCD's constitutional claims were not essential to the resolution of the case.

In conclusion, we AFFIRM the Court of Chancery's ruling that Council's decision must be invalidated. Council failed to provide an adequate explanation of its reasoning process, thereby thwarting judicial review of its decision. We hold that unless the reason for Council's action is unequivocally obvious from the record, Council must provide some clear statement of its rationale. We also hold that the mere fact of a conflict between a proposed rezoning and the Comprehensive Development Plan does not excuse Council's failure to explain its actions. Finally, we find no error in the Court of Chancery's dismissal with prejudice of BCD's constitutional claims. However, we hold that the rezoning process must be reinitiated to insure that Council will not base its decision upon outdated information. The judgment of the Court of

---

5. BCD argues that this remedy places the burden of Council's error upon BCD, since it must again incur the delay and expense that a rezoning application entails. We do not believe that the cost imposed upon BCD is an appropriate consideration. Although BCD seeks to advance its own interests by prosecuting this appeal, our decision must reflect a concern for the goals that the General Assembly sought to advance by delegating much of its authority to regulate land use. If we are to have confidence that Council

is acting responsibly, it must be clear that it has acted within the scope of its authority. Similarly, it must be clear that it has relied upon timely information. Thus, the expense incurred by BCD is necessary to insure that the ultimate goal of preventing arbitrary and capricious decisions is advanced. We note also that BCD is not alone in bearing the costs of its zoning application, and that the costs incurred by Council should encourage it to provide adequate explanations for its actions in the future.

Chancery is AFFIRMED in part and RE-VERSED in part.