# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| TD REHOBOTH LLC and<br>OVERBROOK ACRES, LLC, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | **C.A. No. 12432-VCS** |
| | : | |
| SUSSEX COUNTY COUNCIL, the governing<br>body of Sussex County Delaware, | : | |
| | : | |
| Defendant, | : | |
| | : | |
| and | : | |
| | : | |
| RICH BORRASSO, JOHN D. VINCENT,<br>JUDY A. VINCENT, KENNETH HOPKINS,<br>SUSAN HOPKINS, SUSABAR LIMITED<br>LIABILITY PARTNERSHIP, RICHARD<br>HOLTKAMP, and JEFFREY STONE, | : | |
| | : | |
| Intervenor-Defendants. | : | |

## MEMORANDUM OPINION

Date Submitted: July 12, 2017
Date Submitted: August 11, 2017

Richard A. Forsten, Esquire and Gerard M. Clodomir, Esquire of Saul Ewing LLP, Wilmington, Delaware, Attorneys for Plaintiffs.

David N. Rutt, Esquire of Moore & Rutt, P.A., Georgetown, Delaware, Attorney for Defendant.

Robert V. Witsil, Jr., Esquire of Robert V. Witsil, Jr., P.A., Georgetown, Delaware, Attorney for Intervenor-Defendants.

**SLIGHTS, Vice Chancellor**

Plaintiffs, TD Rehoboth LLC and Overbrook Acres, LLC, ask this Court to enjoin enforcement of, and declare invalid, the decision of the Sussex County Council ("Council") to deny TD Rehoboth's application to rezone for commercial development approximately 114 acres of farm property legally owned by Overbrook and equitably owned by TD Rehoboth (the "Rezoning Application"). Council rejected the Rezoning Application by a vote of 4-1.

The scope of this Court's decision, of course, is limited to the issues raised by the parties—in particular, whether Council created a sufficient record for the Court to review and whether the decisions of certain members of Council, as articulated on the record at a meeting of Council, were arbitrary and capricious. What is not at issue here is whether the Rezoning Application is proper. That is to say the Court has not been asked to opine, and has not considered, whether the Rezoning Application is valid on the merits or, secondarily, whether Council should approve or deny it.

The parties have filed cross-motions for summary judgment. After carefully reviewing the record and the parties' submissions, I conclude that the record relating to the vote cast by one member of Council is inadequate to allow for any meaningful review of that vote or the deliberative process that supported it. As for the vote of another member of Council, I conclude that it reflected an arbitrary and capricious process because the alleged harm identified by the councilmember as a basis for

1

denying the Rezoning Application preexisted the filing of the application and, therefore, bore no relationship to it.  The two votes at issue here are important because, if cast in the other direction (in favor of the Rezoning Application), the outcome of Council's decision on the application would have been different.[1]  Accordingly, the Rezoning Application must be re-submitted to Council for another vote.  That vote will be what it will be.  And so long as the record of the vote is adequate to allow for meaningful review, and the vote itself is not the product of arbitrary or capricious decision-making, the results of the vote, whatever they are, will stand.

## I.  BACKGROUND

The facts are drawn from the parties' pleadings and the evidence gathered in appendices to the parties' briefs submitted in connection with their cross-motions for summary judgment.[2]

### A. Parties and Relevant Non-Parties

Plaintiff, TD Rehoboth, is a Delaware limited liability company that is the equitable owner of 114.4821 acres +/-, District 2-35, Map 23.000, Parcel 1.00, Broadkill Hundred, Sussex County, located on the northeast side of Route One

---

[1] As noted, the vote was 4-1 against the Rezoning Application.  If the two votes at issue changed from "no" to "yes," the Rezoning Application would have been approved by a vote of 3-2.

[2] *See* Ct. Ch. R. 56(c).

(Coastal Highway) across from Route 88 (Cave Neck Road) (the "Property"). Plaintiff, Overbrook Acres, is a Delaware limited liability company and the legal owner of the Property. Together, TD Rehoboth and Overbrook shall be referred to as the "Owners."

Council is the governing body of Sussex County, a political subdivision of the State of Delaware. It is charged with responsibility for reviewing and ultimately approving (or not) applications for rezoning in connection with properties that lie in areas within Sussex County that are outside of the jurisdiction of other zoning authorities.

Intervenors, Rich Borrasso, John D. Vincent, Judy A. Vincent, Kenneth Hopkins, Susan Hopkins, Susabar Limited Liability Partnership, Richard Holtkamp, and Jeffrey Stone (collectively, "Intervenors"), are landowners who own property located adjacent to or near the Property. They were active participants in the public hearing process and objected to the proposed rezoning of the Property.

## B. The Rezoning Application

TD Rehoboth applied for the rezoning of the Property from its current zoning of AR-1 (Agricultural Residential) to CR-1 (Commercial Residential) with plans to construct an 850,000 square foot commercial shopping center.[3] The Sussex County

---

[3] Pls. TD Rehoboth LLC and Overbrook Acres, LLC's Opening Br. ("Pls.' Opening Br.") Ex. A, Ex. C.

3

Planning and Zoning Commission (the "Commission") held a public hearing to address the Rezoning Application on April 23, 2015.[4] Thereafter, on June 11, 2015, by a vote of 3-2, the Commission recommended that Council approve the Rezoning Application.[5]

Council held its first public hearing on the Rezoning Application on June 2, 2015.[6] The themes advanced by counsel for the Owners during this meeting included that the Rezoning was consistent with Sussex County's Comprehensive Plan; the Property is located in an area the Comprehensive Plan designates as a "growth zone"; the Property is located along an area of Route One where several other commercial properties have already been developed; the Property is in an area that the State has designated as "Investment Level 3" where growth is anticipated; there are no environmental issues associated with the development of the Property;

---

[4] Defs.' and Intervenor-Defs.' Answering Br. in Resp. to Pls.' Mot. for Summ. J. and Opening Br. in Supp. of Joint Defs.' Cross Mot. for Summ. J. ("Defs.' Answering Br.") Ex. A, at 12–21.

[5] Defs.' Answering Br. Ex. B, at 7.

[6] Pls.' Opening Br. Ex. D; Defs.' Answering Br. Ex. C. Both parties produced only "relevant excerpts" of the transcript from the June 2, 2015 meeting. Notably, this public meeting of Council was convened before the Commission's final vote in favor of the Rezoning Application.

and the Owners would contribute $8 million to a Route One overpass project at the site of the Property that had been long planned by DelDOT.[7]

Several members of the community spoke out against the Rezoning Application. One area of complaint particularly relevant to this dispute focused on whether the development of a large commercial complex on the Property would negatively affect the ability of surrounding farmers to engage in effective aerial crop-dusting on their properties.[8] In this regard, Council received a letter from a local crop-duster, Jeffrey A. Chorman, who stated that the rezoning would make the rendering of his services to the surrounding farms far more difficult.[9] According to Chorman, Federal Aviation Administration ("FAA") regulations would preclude him from crop-dusting the fields adjacent to the Property if it were rezoned to CR-1 because the area would likely then be deemed "congested."[10] While the FAA can waive enforcement of this rule, Chorman stated that the Philadelphia office of the

---

[7] Pls.' Opening Br. Ex. D, at 17:16–90:5.

[8] *See id.* at 193:6–94:9, 309:7–20; Defs.' Answering Br. Ex. C, at 292:10–96:10, 307:6–10:17.

[9] Defs.' Answering Br. Ex. F.

[10] *Id. See also* Pls.' Opening Br. Ex. E (relevant FAA regulations). When an area is deemed "congested" by the FAA, crop-dusting is not permitted over that "congested" area unless "operated at altitudes required for proper[] accomplishment of the agricultural operation and approval from the governing body, notice to the public and an operation plan submitted and approved by the FAA Flight Standards District Office." Pls.' Opening Br. Ex. F.

5

FAA will not grant waivers to fly over "congested" areas unless there is a public health emergency.[11]

In response to prompting by Council for more information on the impact of the Rezoning Application on crop-dusting, Jannelle Cornwell, the Planning & Zoning Manager for the Sussex County Planning Department, wrote a memorandum to Council, dated August 11, 2015, in which she explained her understanding of the FAA restrictions:

> The FAA allows aircraft to go below 500' above the surface and closer than 500' to people and structures when spraying for agricultural purposes if the spraying and aircraft does not create a hazard. The FAA rules state that no person may conduct an agricultural aircraft operation over a congested area unless operated at altitudes required for proper[] accomplishment of the agricultural operation and approval from the governing body, notice to the public and an operation plan submitted and approved by the FAA Flight Standards District Office. The FAA rules do not define congested area and do not indicate what the safe distance is for operation within a congested area.

James A. Fuqua, Jr., Esquire, an attorney who represented the Owners throughout the rezoning process, submitted a letter to Council, dated September 1, 2015, in which he also addressed the crop-dusting issue:

> Over 'congested areas' an aircraft may operate at altitudes required for the accomplishment of the Agricultural Aircraft Operation provided, 1) written approval is obtained from the local governing body, 2) notice of the operation is given to the public and 3) a plan of the operation is submitted to and approved by the FAA local office.

---

[11] Defs.' Answering Br. Ex. F.

As noted in [Cornwell's] memorandum, the FAA Regulations do not define 'congested areas' and such a determination must be made by the FAA inspectors on a case by case basis. . . . Under FAA Regulations even only two or three homes in an area with thirty homes in the general vicinity is a 'congested' area. . . . While it is true that the development of a shopping center on the site would most likely qualify as a 'congested' area for FAA purposes, it must be more importantly noted that any commercial or residential improvement to the site, including a currently permitted AR-1 subdivision would also result in a 'congested' designation.

In summary, <u>any</u> commercial or residential development of the applicant's site would result in it being considered a 'congested' area. However, aerial spraying can still occur either as authorized by Section 137.51, by the use of helicopter spraying or by avoiding directly flying over the area.[12]

## C. Council's Decision

The vote on the Rezoning Application was delayed until April 12, 2016.[13] All five members of Council were present and voted at the meeting.[14] As required, each Council member stated his or her position on the record before casting a vote.

Councilwoman Deaver spoke first and voted "no" on the Rezoning Application.[15] She cited numerous reasons in support of her vote against the change in zoning, including that: commercial zoning of the Property would be inconsistent

---

[12] Pls.' Opening Br. Ex. G.

[13] Pls.' Opening Br. Ex. H ("Council Tr.").

[14] *Id.*

[15] *Id.* at 10:15–16.

7

with the character of the surrounding area; the Property is located in an environmentally sensitive area; the size of the parcel to be rezoned would pose infrastructure challenges; the public had expressed valid concerns about increased traffic in the area; the CR-1 zoning would potentially allow for other (and even more inappropriate) uses of the Property; and, ultimately, "[the rezoning] doesn't really promote the health, safety, morale, convenience, order, prosperity or welfare of the present or future residents of Sussex County as we have in Section 6904, Title 9 of the Delaware Code."[16]

Councilman Cole followed. He began his remarks by stating that he would also be voting no. As grounds for his vote, he expressly adopted the fourteen reasons that one of the members of the Commission had previously laid out in his public remarks before voting to reject the Rezoning.[17] He noted, in addition, that he did not believe there was a large enough population base to support the proposed commercial use, that there were traffic concerns and that it is "not good zoning to place your highest and most commercial, your intense commercial districts, next to your lowest density ag[ricultural] districts. They're not compatible uses."[18]

---

[16] *Id.* at 5:10–10:16.

[17] *Id.* at 10:18–11:1.

[18] *Id.* at 11:2–21.

8

Councilman Arlett spoke next and voted in favor of the Rezoning Application. That vote, and the bases for it, have not been addressed by the parties.

Councilman Wilson spoke next. He began his remarks by stating that he would lay out "both sides on this thing."[19] He then proceeded to provide several reasons why one might vote in favor of the Rezoning Application, noting that Councilwoman Deaver had already provided reasons to vote against it.[20] What follows, at least as appears in the cold record, are Councilman Wilson's internal deliberations spoken aloud for all to hear. Unfortunately, his deliberations wandered at times into memories of his family and of Sussex County in days gone by. As all parties agreed at the oral argument on the motion, the remarks are difficult to follow. At the conclusion of his prolix remarks, in the midst of his apparent attempt to state "both sides" of the issue, Councilman Wilson abruptly concluded by stating "Right now, I'm in favor of denial."[21] He offered no bases for his vote.

---

[19] *Id.* at 28:14–17. *See also id.* at 29:18–21 ("I got a list here from all the way one to twenty why not vote for it, why vote for it.")

[20] *Id.* at 29:9–13 (stating that "I could give you a lot of favor of why we should vote or not vote for it. As [Councilwoman Deaver has] read half of why we should not vote for it, so I can tell you why we should vote for it. So, you know, you've heard it all.").

[21] *Id.* at 34:13–14. To illustrate the difficulty the Court has confronted in understanding these remarks after reading them in the transcript of the hearing, it is necessary to quote the remarks in full. In doing so, I intend no disrespect. To the contrary, as a judge, I too have encountered the uncomfortable reality that, as much as I thought I was being clear while I wrestled with my thoughts aloud, the cold pages of a transcript have, at times, revealed that I was being anything but clear. Such is the challenge of articulating spontaneous thoughts for public consumption. Not meeting that challenge typically carries

The lack of clarity, however, *is* consequential when others are obliged to try to make some sense of our thinking in order to determine whether we have followed an orderly deductive process. Unfortunately, that is where we are in this case.

Councilman Wilson's statement, in full, reads:

"Well, folks, when I think about it, I've lived here many, many years, all my life. My dad and mom lived here for many years before that, so I can tell you how bad the highway is. I can tell you when you're trying to get to Nassau, you have to stop on Saturday afternoon four miles out before you ever get to the bridge. I can remember when you used to go down to the beach and you'd buy a lot down there for $50 an acre right on the ocean. It's nothing but a sand trap, they called it. So, I made a poor investment; I should have bought more land. So, I can say some of you guys moved here, came here after I did, I could say the same thing, most of you should leave because what you've done is brought too much traffic down this way. So, I have no problem, you know that.

My problem is, this piece of land is, I can tell you both sides on this thing. So, I think I'm going to give you, think about both sides on this. The State Highway has also said they'd give us 8 million dollars next to Cave Neck Road if we put an overpass there. So, 8 million dollars. Think about this. We haven't got a penny from no private individual all the way from Frederica down, from Thompsonville, you name it, Milford, all of them, nobody's give us any money. So, I think, in a lot of ways, there could be a lot of good come from this.

Of course, my son is the first one tries to get his tractor down the road. Says, look at all the traffic, you can't get up and down this highway. And, as a farmer—I'm really the only farmer on this Board—so, I tell you, I really believe that we should do what's right here, and as far as I'm concerned, I could give you a lot of favor of why we should vote or not vote for it. As Joan's read half of why we should not vote for it, so I can tell you why we should vote for it. So, you know, you've heard it all. I'm pretty sure you all got to go to dinner sometime, so I better take my time and tell you why we should vote for it.

I got a few notes wrote down here. Let me see, where are they? Voting for it, in favor. Believe it not, I got a list on both of these. I got a list here from all the way one to twenty why not vote for it, why vote for it. And I've rattled it in my head for a long time here, in fact, most of you know by now from reading the paper, I've had a stroke and I had a stroke. I'm very fortunate. Thank God that I'm here this far. Most people, when I look back at strokes, I don't know many of them would have made this far really. I go to visit a lot of people in homes that's had strokes and they can't even speak. So, God's really blessed me more than I can ever, more than I deserve.

So, God's give us a lot of free land here, so a lot of farmland's been gone as I look back over a period of time. And I can see what's happened. I got a kid, I got a child, I got

children—kids are goats, I hear a lot of people say I got kids and I say no, I have children. My children like to go on farming, I'm pretty sure. I got two sons that wants to go on farming. One very interested. But, what are we doing? We're losing our farmland because of people are bidding up our land up so high, they're coming in here and crowded up our highways, crowding up and running up the price of land so high that we can't afford to have this. So, you can't even afford to go in that direction.

So, I can tell you the reason why I should—well, I can easily tell you why I'd not vote for it. But you know the law does say this—it says property rights tells you one thing, doesn't it? Suppose the law had been passed before you moved here and we said, we can't sell you no land. This is a joke where I hear some friends say, well, the land's too big, it's just too big, you can't do that much at one time. That's an unfair statement, I think. Do you guys realize that this piece of land has already been zoned and you can put homes in here? Do you also realize that when you put homes there, you have more traffic than ever? Because there's going to be people every day coming out of those homes. That's the way I think. I don't see how we're going to have any less. I've thought a lot about that.

So, anyway, the Applicant prepares a Traffic impact Study. Del-DOT's Corridor Capacity Preservation Program manager has no objection to the agreements of the Del-DOT prior to the entrance plan approval of the construction of intersection and roadway improvements as set forth in Del-DOT. A letter dated September 9, 2014 to the Traffic Group, Inc. This will occur prior to the development of the property. The Sussex County Conservation District commented that the Applicant will be required to follow recommended erosion and sediments control practices and during any construction to maintain vegetation after completion of any construction. That no storm flood hazard area is affected. That is, it would be highly likely that the project will necessitate off-site drainage improvements and on-site drainage improvements and that no tax ditch is affected. The Applicant's proposal is in conformity with the Comprehensive Plan that the purpose of the CR-1 zone district zoning ordinance Section 115-83-.183 plus 1. This improves sufficient space and appropriate location for a wide variety of commercial and miscellaneous service.

You know, talk about traffic—I was down here to the nursing home to see where Mr. Millman was pretty bad off, and I'll tell you, I never saw so much traffic in my life. They didn't want no shopping center down there on Townsend land. There's more traffic than a little bit; or across from that high school there in Lewes. Believe it or not, people are just going to move in here. I'll guarantee you, they're going to move here, so you can all fuss about it. It won't matter. It won't matter because they're going to come here. You came here this time. You're going to tell your friends to come back and say, this is the world's best place you ever lived. You all ought to come to Delaware. So, there's going to be part of the problem, I think. The word's been passed. You're not going to get around it. I've lived here so long, I know what's happened. When you leave here, you're going to say, no, that's not a good place, this is a good place to come. Low taxes; taxes, do you

11

Councilman Vincent was the last member of Council to speak. He cast his vote as "no" on the Rezoning Application.[22] While Councilman Vincent made a faint reference at the outset of his remarks to the comments made by Councilmembers Cole and Deaver when they voted against the Rezoning Application, the majority of his statement was directed towards the potential impact the Rezoning Application could have on the surrounding farmers and their ability to crop-dust.[23] Specifically, he stated:

> one of the things that I guess struck me a lot was, I am certainly a person that believes in property rights. I think we all have property rights. But I will also tell you that I don't think my property rights should affect yours and that what I do on my land should not negatively affect what

realize taxes here are, in one month, New Jersey pays as much in one month as you pay here in a year? I had a friend of mine the other day moved here from New Jersey, he said, I can't believe the taxes I pay here, I thought I was going to pay them monthly, come to find, they're for a year. So, that's really cheap when you think about it. That's why you're going to come here.

The reason you're coming here—let me tell you why, how I'm going to vote on this thing because that's what you're all waiting for anyway. Okay. So, I can actually tell you, I got two sheets here that says the same, how you going to vote? I've asked myself that many times. My wife has asked me that many times. I said, honey, I can't honestly tell you. I said, I'm trying to let the Lord lead in this direction, and he hasn't told me who should come here and who should not come here. So, you kinda got to look at it that way.

Now, Mr. George over here, he wants more tourists in here and he wants lesser traffic. Tell me how he's going to get them here. I don't know. Maybe a helicopter; I haven't figured that out yet. Okay. Thank you. Right now, I'm in favor of denial."

*Id.* at 27:21–34:14.

[22] *Id.* at 36:20–21.

[23] *Id.* at 34:19–36:21.

you do on your land. So, what struck me, I guess, out of all this maybe the most, maybe not quite the most, but if you were here at the public hearing and you heard a record read into from a cropduster [sic] in the area and it says that this property could be deemed a congested area by FAA Regulations. And I will tell you, if you go and read, there are no drop down boxes FAA Regulations as to what's going to be congested, what's not going to be congested. The person comes down, they look at it, and they make a decision. You might like it, you might not like it. Federal regulations limit the method and general use of aerial spraying over congested areas which will have an adverse impact on neighboring farms' ability to effectively farm their land in a manner consistent with current practices. The definition of congested area is not clearly defined. There is no set numbers of houses or stores or specific activity that triggers the determination. However, in Mr. Fuqua's memo who answered back the FAA regulations it says: It is true that the development of a shopping center on a site would most likely qualify as a congested area.

I don't think it's fair for me to vote to approve something that could have an effect on the farmers around there and what they could do with their property; and that would say that they maybe couldn't grow certain crops or those kind of things, and I think that's wrong. So, for those reasons, I'd say that I would be a no vote.[24]

With the final vote cast, the Rezoning Application was denied 4-1.[25]

### D. Procedural Posture

TD Rehoboth and Overbrook filed their Verified Complaint for Permanent Injunction and Declaratory Judgment against Council on June 8, 2016. The motion

---

[24] *Id.* at 35:9–36:21.

[25] *Id.* at 36:23.

to intervene filed by Intervenors was granted on August 29, 2016.  The parties filed their cross-motions for summary judgment soon after.

## II. ANALYSIS

The cross-motions for summary judgment require the Court to determine whether the statement provided by Councilman Wilson setting forth the bases for his vote is adequate to allow for judicial review and whether Councilman Vincent's "no" vote was arbitrary and capricious.  The standards governing the cross-motions and the review of Council decisions on zoning applications are well-settled.

### A. Standard of Review on Cross-Motions for Summary Judgment

Under Court of Chancery Rule 56(h),

> when the parties have filed cross-motions for summary judgment and, as here, have not argued that there is an issue of fact material to the disposition of either motion, 'the Court shall deem the motions to be the equivalent of a stipulation for decision on the merits based on the record submitted with the motions.'  Thus, the usual standard of drawing inferences in favor of the nonmoving party does not apply.[26]

The parties agree that the record on the cross-motions is fixed.  There is no room or need for further discovery.

---

[26] *Farmers for Fairness v. Kent Cty.*, 940 A.2d 947, 954–55 (Del. Ch. 2008) (quoting Ct. Ch. Rule 56(h)).

## B. Standard of Review of County Council Rezoning Decisions

When a final zoning authority considers a rezoning application, the court will "usually presume" that the decision is valid "unless clearly shown to be arbitrary and capricious because it is not reasonably related to the public health, safety, or welfare."[27] The burden of rebutting the presumption of validity and of showing that a rezoning decision is arbitrary and capricious is on those challenging the decision.[28] The role of the court in reviewing a zoning decision is narrow and focused, with the purpose being "to determine whether [Council's] acts are supported by a 'record of substantial evidence'" and whether its ultimate determination is arbitrary and capricious.[29]

The court will deem a zoning decision "arbitrary and capricious" where it is the product of "an unreasoned, irrational or unfair process."[30] Legislative acts undertaken by Council have been found to be arbitrary or capricious where "the action [is] 'whimsical or fickle' or 'not done according to reason,'" or where the

---

[27] *Tate v. Miles*, 503 A.2d 187, 191 (Del. 1986).

[28] *Id.*

[29] *Save Our Cty., Inc. v. New Castle Cty.*, 2013 WL 2664187, at *9 (Del. Ch. June 11, 2013), *aff'd sub nom.*, *Barley Mill, LLC v. Save Our Cty.*, 89 A.3d 51 (Del. 2014). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Falconi v. Coombs & Coombs, Inc.*, 902 A.2d 1094, 1098 (Del. 2006).

[30] *Id.*

15

action was "'unconsidered' or 'taken without consideration of and in disregard of the facts and circumstances of the case.'"[31]  Additionally, Council cannot act "in an arbitrary fashion that subjects some property owners . . . to unwritten, subjective restrictions that the Council is not willing to impose on similarly situated property owners."[32]

At oral argument, Council and Intervenors asserted that the Court may engage in a plenary review of the record developed by Council in search of any "substantial evidence" that might support Council's decision, even if not the evidence expressly relied upon by the Council members.  I disagree.  As our Supreme Court recently reiterated, "the role of a court in reviewing a zoning decision is limited and a court will not second-guess the Council's decision or substitute its own judgment for that of the Council."[33]  In keeping with this deference, the Court must focus on the decision made by Council, as expressed by its members, when determining whether

---

[31] *Id.*

[32] *Gibson v. Sussex Cty. Council*, 877 A.2d 54, 47 (Del. Ch. 2005).

[33] *Barley Mill*, 89 A.3d at 60.  *See also id.* at 62–63 ("*Tate* did, however, make an important point about the role of a reviewing court when it recognized the need for the judiciary to respect the legislative process by being appropriately deferential in its review of elected officials when they make the difficult judgments entrusted to them.  Thus, when the Council provides reasons for its decision that are supported by the record and not the product of a legal error, reviewing courts should not substitute their own judgment for that of the Council.") (internal citations omitted).

the bases for that decision can be discerned from the record and whether it was "arbitrary and capricious."[34]

Finally, the Court must remain mindful that the rezoning function "resembles a judicial action," making it subject to judicial review.[35] Therefore, just as trial courts are obliged to do, Council must create a "'record sufficient to withstand judicial challenge' because '[u]nless [the] Council creates a record or states on the record its reasons for a zoning change, a court is given no means by which it may review the Council's decision.'"[36] Council need not follow a particular roadmap when reciting the grounds for its decision and perfection is neither expected nor required.[37] Instead, it is enough that Council states its reasons with sufficient clarity that the court is not left to guess why the decision was made and is able to make the requisite determination that the decision was not the product of arbitrary or capricious reasoning.

---

[34] *Id.* at 63.

[35] *Tate*, 503 A.2d at 191.

[36] *Barley Mill*, 89 A.3d at 61 (quoting *Tate*, 503 A.2d at 191).

[37] *New Castle Cty. Council v. BC Dev. Assocs.*, 567 A.2d 1271, 1276–77 (Del. 1989) ("It is true that *Tate* allows Council a measure of flexibility. Council need not draft a detailed statement of findings of fact and conclusions of law in order to explain a given zoning regulation. . . . We lay down no precise formula that Council must follow in order to satisfy the *Tate* requirements.").

## C. The Votes

The Owners primarily take issue with the votes cast (and decisions made) by Councilmen Wilson and Vincent. I address these votes, and the stated bases for them, in turn.[38]

### 1. Councilman Wilson's Vote

Characterizing Councilman Wilson's vote, the Owners observe, "he spoke the longest of all the Council members, yet his comments provide no basis to understand why he voted against the rezoning—indeed his remarks are full of reasons that support a rezoning, and, in several instances he pushes back against reasons given

---

[38] The Owners have far less to say about the votes cast by Councilwoman Deaver and Councilman Cole, but they do challenge them. With respect to Councilwoman Deaver, the Owners take issue with her statements that: (1) the Property is not part of an existing commercial corridor, (2) the Property's size will pose infrastructure challenges, (3) there are many approved uses under a CR-1 zoning designation in addition to the proposed shopping center, and (4) the testimony at the hearing provided many other reasons to oppose the Rezoning Application. Pls.' Opening Br. 26–28. After carefully reviewing the Owners' expressed concerns with respect to the bases for Councilwomen Deaver's decision to vote against the Rezoning Application, I am satisfied that her reasoning was clearly and thoroughly stated and that, at best for the Owners, the rationale for her decision might be "fairly debatable." *Tate*, 503 A.2d at 191. It cannot be said, therefore, that her decision was arbitrary or capricious. *Id.* As for Councilman Cole, he began his statement by adopting the thorough and comprehensive reasoning of a member of the Commission as stated in support of the commissioner's vote against the Rezoning Application at the Commission's hearing. Council Tr. 10:18–21. While Councilman Cole then went on to add a few additional bases of his own, which the Owners contend are not supported by the evidence, it is clear that the councilman was relying principally upon the commissioner's rationale to support his own "no" vote. The Owners have not attempted to expose error in that aspect of Councilman Cole's reasoning. Accordingly, they have failed to meet their burden of rebutting the validity of his vote and, therefore, the vote "must prevail." *Tate*, 503 A.2d at 191.

18

for opposing the rezoning."[39]  Council and Intervenors see Councilman Wilson's remarks differently.  In their view, the councilman demonstrated a "very clear intent to give a sense of both sides of the issues before Council. . . .  What is clearly evident from his statements is that he thoroughly reviewed the record and the evidence presented by both the [Owners] and the opponents."[40]

I agree with Council and Intervenors that Councilman Wilson's remarks reflect a laudable attempt to explain and balance both sides of the Rezoning Application.[41]  A fair reading of these remarks, however, is that Councilman Wilson actually found the arguments in favor of the Rezoning Application more persuasive. With that said, it may be that Councilman Wilson's apparent slant in favor of the Rezoning Application was a product of the fact that, as he acknowledged, Councilwoman Deaver had already stated many reasons to oppose the application. The problem, of course, is that the record does not answer why Councilman Wilson abruptly ended his recitation of reasons to support the Rezoning Application by summarily voting to reject it.  This vacuum leaves the Court to speculate—to speculate whether he found Councilwoman Deaver's rationale to be persuasive and

---

[39] Pls.' Opening Br. 20.

[40] Defs.' Answering Br. 20–21.

[41] *See* Council Tr. 29:10–12 ("As [Councilwoman Deaver has] read half of why we should not vote for it, so I can tell you why we should vote for it.").

dispositive; to speculate whether he had his own reasons to reject the Rezoning Application; and, most fundamentally, to speculate whether he, in fact, intended that his final vote be cast as a "no" vote.[42]  Because Councilman Wilson did not "state the reasons for [his] decision on the record,"[43] his vote on the Rezoning Application is invalid.  This is so for the simple reason that he did not create an adequate record to enable the Court to engage in meaningful judicial review of his decision.[44]

## 2. Councilman Vincent's Vote

While it is true, as Council and Intervenors point out, that Councilman Vincent began his remarks by briefly acknowledging the concerns with the Rezoning Application elucidated by Councilmembers Deaver and Cole, he focused nearly all of his remarks on the potential impact that rezoning to CR-1 would have on the ability of nearby farmers to crop-dust their fields.  The Owners take issue with this reasoning on two grounds.  First, they contend, "Mr. Vincent is simply wrong in his

---

[42] *See BC Dev.*, 567 A.2d at 1276 ("Council's reasons must be clear from the record.  If several possible explanations for a given decision appear on the record, the reviewing court must not be left to speculate as to which evidential basis Council favored.").

[43] *Barley Mill*, 89 A.3d at 62.

[44] *See BC Dev.*, 567 A.2d at 1276 ("[W]hen a court overturns an action taken by Council because of a failure to articulate reasons, it is not necessarily holding that the action was not in accordance with the law and therefore was arbitrary and capricious.  Rather, it is holding that Council has not permitted the Court to perform its role in the review process, *i.e.*, to form an opinion of the propriety of Council's action.").

conclusion that development of the Property will foreclose cropdusting [sic]."[45] According to the Owners, a "congested" designation by the FAA would merely place additional conditions on crop-dusting; it would not foreclose the practice altogether.[46] But Councilman Vincent never stated that farmers near the subject property would be forbidden to engage in crop-dusting. Rather, he merely observed, "Federal regulations limit the method and general use of aerial spraying over congested areas which will have an adverse impact on neighboring farms' ability to effectively farm their land in a manner consistent with current practices."[47] He went on to explain, "I don't think it's fair for me to vote to approve something that could have an [e]ffect on the farmers around there and what they could do with their property . . . ."[48] The fact that the "congested" designation "could have an effect" on the nearby farmers' ability to crop-dust on their properties, as recognized by Councilman Vincent, is supported by substantial evidence.[49]

---

[45] Pls.' Opening Br. 24.

[46] *See id.* ("Even if the Property is deemed "congested," adjoining areas can still be crop-dusted, provided (i) they comply with an approved plan or (ii) the crop-duster never flies over the congested property or (iii) the crop-duster uses a helicopter.").

[47] Council Tr. 36:3–7.

[48] *Id.* at 36:15–18.

[49] *See* Pls.' Opening Br. Ex F, Ex G; Defs.' Answering Br. Ex F.

The problem with Councilman Vincent's focus on the issue of crop-dusting is not that he misunderstood the consequences of the "congested" designation; the problem is that the evidence of record reveals that the restrictions on crop-dusting will occur regardless of whether the Property is developed under the requested CR-1 rezoning or the current AR-1 zoning. Councilman Vincent made a point of citing to the letter submitted by Mr. Fuqua in support of his view that "the development of a shopping center on [the] site would most likely qualify as a congested area."[50] But there is more to Mr. Fuqua's letter that bears directly on the "congested designation" issue that Councilman Vincent did not recite. Of particular relevance here, the letter confirms: "While it is true that the development of a shopping center on the site would most likely qualify as a 'congested' area for FAA purposes, *it must be more importantly noted that any commercial or residential improvement to the site, including a currently permitted AR-1 subdivision would also result in a 'congested' designation*."[51]

The Owners contend that the arbitrary and capricious character of Councilman Vincent's vote is revealed in his failure to understand or acknowledge that the primary basis for his decision to reject the Rezoning Application (the impact of

---

[50] Council Tr. 36:11–14.

[51] Pls.' Opening Br. Ex. G, at 4 (emphasis added). *See also id.* at 5 ("In summary, <u>any</u> commercial or residential development of the applicant's site would result in it being considered a 'congested' area.").

developing the property on crop-dusting) existed prior to the filing of the application, and would remain with the Property notwithstanding Council's decision to reject the application. In support of this argument, the Owners cite to this court's decision in *Gibson v. Sussex County Council*,[52] where the court held that "Council may not rely upon a reason 'that subjects some property owners . . . to unwritten, subjective resisting that Council is not willing to impose on similarly situated property owners.'"[53]

*Gibson* involved Council's denial of a conditional use application to allow the construction of a three-unit townhouse.[54] Council heard significant community opposition to the application that was based upon alleged harms to surrounding property that would be caused by the proposed residential development of the property at issue. The evidence of record revealed, however, that existing residences in that zone already posed the exact same harms to surrounding properties that were the subject of the complaints expressed at the hearing.[55] Given these facts, the court

---

[52] 877 A.2d 54 (Del. Ch. 2005).

[53] Pls.' Opening Br. 25 (quoting *Gibson*, 877 A.2d at 57).

[54] *Gibson*, 877 A.2d at 59. The arbitrary and capricious standards that apply in the context of review of rezoning applications "apply with equal (or even greater) force to the granting or denial of conditional use permits." *Id.* at 66.

[55] *Id.* at 78–79 (noting that "the objectors did not substantiate their generalized concerns with specific evidence about the threat posed by the Project and, as important, did not

23

held that Council's decision to deny the application based on the harms identified by the opponents to the application was arbitrary and capricious because:

> [w]hen the basis for public opposition is not that the applicant is not following the legislatively applicable rules . . . but that the rules of general applicability—from which the opponents themselves have benefitted—have led to a situation that calls out for general policy reform, the Council may not simply bend to the wind in the room and single out that applicant for disparate treatment. Rather, the answer for the opponents and the Council is to address the underlying problems in the proper way, through the implementation of rules of general applicability that limit uses of property that pose a threat to legitimate concerns of public interest. What is not acceptable is for Council to retain general rules that permit some residents (like the existing residents of the area) to burden the environment, roads, and water quality while reserving to itself the right to pick out those to whom the same privilege should be denied.[56]

While *Gibson* is not directly on point, it does provide useful guidance in determining whether Councilman Vincent's decision was arbitrary and capricious. The evidence in the record relating to the Rezoning Application, including Mr. Fuqua's letter—the very evidence selectively relied upon by Councilman Vincent—reflects that any development of the Property, under AR-1 (as currently permitted) or CR-1 (as rezoned), would have the exact same impact on the ability of surrounding famers to crop-dust on their properties. Yet Councilman Vincent did

---

differentiate between the harms created by the existing residences and roads to the values they sought to advance and the marginal threat to those values posed by the Project").

[56] *Id.* at 78.

not "differentiate" between the harms potentially caused by permitted development under the current zoning and the harms that he was concerned would flow from the proposed rezoning.[57] Indeed, the record reveals that Councilman Vincent based his decision to deny the Rezoning Application on a potential for harm that was already extant with the current zoning of the Property. Thus, his decision was made "without consideration of and in disregard of the facts and circumstances of the case"[58]— namely that the "congested" designation is likely to follow any development of the Property regardless of the zoning designation. This is the very definition of an arbitrary and capricious decision.[59]

Council and Intervenors contend that even if Councilman Vincent's comments regarding crop-dusting might suggest that his rejection of the Rezoning Application was arbitrary and capricious, any such suggestion is overcome by the fact that he clearly adopted the reasoning of Councilmembers Deaver and Cole at the outset of explaining the bases for his decision. These efforts to airbrush Councilman Vincent's remarks amount to improper revisionism. While Councilman Vincent did reference the comments made by Councilmembers Deaver and Cole, he

---

[57] *Id.*

[58] *Willdel Realty v. New Castle Cty.*, 270 A.2d 174, 178 (Del. Ch. 1970).

[59] *Save Our Cty.*, 2013 WL 2664187, at *9 (stating that the "arbitrary and capricious" standard "is a unitary term implying an unreasoned, irrational or unfair process").

never stated or even intimated that he agreed with them and certainly never suggested that they were grounds for his vote against the Rezoning Application.[60] On the other hand, it is clear that he premised his decision at least largely (if not entirely) on his view of how the Rezoning Application might affect nearby crop-dusting.[61] In other words, this was a "material" basis for his decision.[62] Given that I have determined that this basis was arbitrary and capricious, and that I am unable to discern from the record whether his decision would been the same had he

---

[60] *Compare* Council Tr. 35:6–11 (Councilman Vincent: "And, you heard the things that were told by Mr. Cole and Mrs. Deaver and I would say in reviewing these things, I asked this question after our first public hearing, and one of the things that I guess struck me a lot was, I am certainly a person that believes in property rights.") with *id.* at 10:18–21 (Councilman Cole: "I'll vote no also. I'll use the reasoning that Mr. Burton on the Planning & Zoning Commission had used in his comments at the end of their public hearing."). If Councilman Vincent had followed Councilman Cole's example and expressly adopted the reasoning set forth by Councilmembers Deaver and Cole, there would be no basis to challenge his vote. Unfortunately, the record he made of his decision supports the Owners' contention that his vote was driven by a concern that was not actually implicated by the Rezoning Application.

[61] *Id.* at 35:15–21 ("So, what struck me, I guess, out of all this maybe the most, maybe not quite the most, but if you were here at the public hearing and you heard a record read into from a cropduster [sic] in the area and it says that this property could be deemed a congested area by FAA regulations.").

[62] *See Save Our Cty.*, 2013 WL 2664187, at *12 (holding that where a councilmember did not obtain information prior to a rezoning vote, that he had stated would have been material to his vote, based on the legally erroneous belief that he had no legal way to obtain that information, his vote was arbitrary and capricious).

understood the crop-dusting issue had no causal relationship to the Rezoning Application, I must conclude that his vote was not valid as a matter of law.[63]

## III.  CONCLUSION

The Court has determined that two of the five votes cast by members of Council on the Rezoning Application cannot withstand judicial review.  Since these two votes affected the outcome of Council's vote on the Rezoning Application, the Owners' motion for summary judgment must be GRANTED and Council and Intervenors' cross-motion for summary judgment must be DENIED.  The Rezoning Application must be re-submitted to Council for a new public hearing and a new vote.[64]  The Owners shall submit an implementing order, on notice to Council and Intervenors, within ten (10) days.

---

[63] *Id.* at *13 (holding that under Delaware law, where a councilmember's vote was arbitrary and capricious, it was invalid).

[64] *See BC Dev.*, 567 A.2d at 1278 ("If a court can confidently conclude that the information available to Council is not outdated, then a new public hearing followed by a new vote and an adequate explanation of Council's decision may provide a sufficient remedy."). At oral argument, Council and Intervenors argued that the Court could merely invalidate Councilmen Wilson and Vincent's votes and act as if they did not show up to the meeting, leaving the vote at 2-1 against the rezoning application.  They offered no authority that would support this result and I am aware of none.  The two votes, if cast in favor of the Rezoning Application, would have resulted in approval.  The fact that the votes were cast but have now been deemed invalid cannot be ignored.